IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY AUSTIN,<br><br>           Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES INC.,<br>CHRISTINE BROWN,<br>PERCY MYERS,<br>BOB BLUM,<br>DAVID MITCHELL,<br>CRISTEL CROW,<br>JANE DOE 1,<br>JANE DOE 2,<br>NURSE JAMES,<br>NURSE SUMMER, and<br>OFFICER BRITTON,<br><br>           Defendants. | Case No. 24-cv-01934-SPM |

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

Plaintiff Larry Austin, an inmate of the Illinois Department of Corrections, brings this civil action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. The First Amended Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. (Doc. 16). Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. § 1915A(b).

### THE FIRST AMENDED COMPLAINT

Plaintiff alleges that on September 5, 2023, while incarcerated at Pinckneyville Correctional Center (Pinckneyville), he was struck in the face with a basketball. (Doc. 16, p. 8).

Plaintiff's nose began to bleed and swell. His nose continued to bleed throughout the day, and his breathing became labored. Plaintiff notified security staff about his issues. An officer told Plaintiff to submit a sick call slip because he, the officer, "couldn't just send [Plaintiff] to [the healthcare unit]." Plaintiff submitted a sick call slip that day but was not seen by medical staff until September 8. During the appointment, Plaintiff was treated by Nurse James. James noted that Plaintiff's nose was broken, but because of Wexford's sick call policy, Plaintiff would have to submit two more sick call slips to be seen by a doctor.

Plaintiff's face continued to hurt, and he had difficulty sleeping and breathing. (Doc. 16, p. 8). For the next two days, he tried to notify medical staff on multiple occasions that his face was hurting, he was unable to sleep, and that it was becoming more difficult to breath. Plaintiff informed Nurse James and Nurse Summer during "med-lines" on September 9 and 10, 2023, about his symptoms. Nurse James, Nurse Summer, and correctional officers expressed skepticism and responded, "You wouldn't be talking if you couldn't breath[e]." He was also ordered by staff to keep moving because "this isn't sick call" when he sought medical treatment for his nose during med-lines. (*Id.*).

Plaintiff states for these few days, his symptoms became increasingly worse. (Doc. 16, p. 8). He experienced pain, "total depravity of sleep and breathing practically rending him disable[d]." Plaintiff had to sleep in a chair and ask for ibuprofen from other inmates to help with his pain. (*Id.*).

Around September 10, 2023, Plaintiff was examined by Nurse Summer. (Doc. 16, p. 9). Summer "bypass[ed]" Wexford's sick call policy and determined that Plaintiff needed emergency medical attention. Summer contacted the healthcare unit and was informed that he would be scheduled. Plaintiff saw Nurse Practitioner Blum the next day. Blum confirmed that Plaintiff's nose was broken and told Plaintiff that in accordance with "Wexford's standard of care policy,"

there was nothing he could do for a broken nose. Blum disregarded Plaintiff's complaint that he was unable to breath and that his nose continued to bleed. Blum told Plaintiff to breath out of his mouth and prescribed a shot of Toradol and an ice pack. After the appointment with Blum, Plaintiff spoke to Nurse Summer about the lack of care he received. Summer told Plaintiff that Blum "was wrong for not sending Plaintiff out for at least [an] immediate x-ray and reset of [his] nose because Plaintiff could have a blood clot or more." (*Id.*). Nurse Summer then told Plaintiff that she would send Plaintiff to see Physician Assistant Desai, "who is higher up than Blum." (*Id.* at p. 9-10).

Plaintiff called his father about his lack of medical treatment, and his father called Pinckneyville and complained. (Doc. 16, p. 10).

The next day, on September 12, 2023, Plaintiff had an appointment with Physician Assistant Desai. (Doc. 16, p. 10). On the way to the appointment, Plaintiff spoke to Dr. Myers about his issues with his nose. Dr. Myers told Plaintiff that PA Desai would take care of him. (*Id.*). When he arrived at the healthcare unit, however, Plaintiff was told by Officer Morgan that the appointment was cancelled. Plaintiff asked to speak to Desai, and Desai told him there was nothing she could do for him since he saw a nurse practitioner the day before. (*Id.*).

Plaintiff's father continued to call the facility and spoke with counselors about Plaintiff's medical care. (Doc. 16, p. 10). Plaintiff submitted more sick call slips. Plaintiff was scheduled for an x-ray and the "M.D. callline" on September 15, 2023. (*Id.*). On the way to the x-ray, Plaintiff spoke to Dr. Myers in the hallway and told Dr. Myers that it was imperative that he speak to him. (*Id.* at p. 11). After the x-ray, Plaintiff was informed that his "M.D. callline" appointment had been canceled. Plaintiff was allowed to speak briefly with Dr. Myers. Plaintiff asked why his appointment was canceled when "it was clear his breathing was compromised." Dr. Myers instructed Plaintiff to return to his housing unit and "put in for sick call." (*Id.*).

Plaintiff submitted multiple sick call slips to "sick call" and to Christine Brown, the

healthcare unit administrator. (Doc. 16, p. 11). Sometime between September 15 and 19, 2023, Plaintiff spoke to Assistant Warden Crow about the lack of medical treatment he was receiving for his nose injury and his associated symptoms. Crow told Plaintiff that she would speak to the healthcare unit administrator and "look further into the issue." Plaintiff never heard back from Crow. Plaintiff's father continued to call the facility and spoke to multiple staff members, including the secretary of the healthcare unit administrator, Macy. Plaintiff was scheduled to be seen by Nurse Practitioner Blum on September 19, 2023, but again, the appointment was canceled. (*Id.*).

Plaintiff spoke to Brown about his situation, and she confirmed that she received his requests and grievances. (Doc. 16, p. 11-12). Brown told Plaintiff that she would talk with Dr. Myers and "get back to [Plaintiff] to ensure [he] received medical treatment." Plaintiff did not hear back from Brown. (*Id.*).

On September 20, 2023, Plaintiff was seen by Dr. Myers. (Doc. 16, p. 12). Dr. Myers "did absolutely nothing" for Plaintiff. Dr. Myers told Plaintiff to "toughen up and deal with it cause hockey players get their nose[s] broke all the time." Plaintiff was again seen by Dr. Myers on September 22, 2023. During the appointment, Dr. Myers told Plaintiff that "since [he] was such a cry baby that he was told to put [Plaintiff] in for [an] ENT consult" even though Plaintiff's x-ray showed a fracture. (*Id.*).

Plaintiff saw the ENT, Dr. Barbarite, in October 2023, who determined that Plaintiff needed surgery. (Doc. 16, p. 13). Dr. Barbarite stated that there was at least 75% obstruction of the right nasal airway and 100% obstruction of the left nasal airway. According to Dr. Barbarite, because of the lack of oxygen, surgery was urgent. Plaintiff's surgery was scheduled for December 4, 2023, but was canceled due to another unrelated medical issue for which Plaintiff was being treated – a cardiologist had ordered for Plaintiff to wear a heart monitor and have a "heart cath

done." (*Id.*). Plaintiff states that the orders for a heart monitor and to have a cardiac catheterization procedure were issued prior to his nose injury but were delayed by "Wexford's collegial review process, policy, or procedure." Because of the delay in care for his cardiac issues, his care for his nose was also delayed. (*Id.*).

Plaintiff was cleared by the cardiologist to have nose surgery on January 16, 2024, but Plaintiff did not have the surgery until March 20, 2024, because of Wexford's collegial review process. (Doc. 16, p. 14). Following surgery, Plaintiff returned to Pinckneyville and stayed in the infirmary overnight. (*Id.* at p. 15). The following day, March 21, Dr. Myers instructed for Plaintiff to return to the cell house. Plaintiff asked about follow-up orders and how and when he would receive pain medicine and cleaning instructions. (*Id.*). Dr. Myers responded that he, Plaintiff, "would figure it out." Officer Morgan asked why Plaintiff was being sent back to general population while still in a vulnerable state. Plaintiff and Officer Morgan asked about Plaintiff's pain medication, and Dr. Myers stated that Plaintiff was to "deal with it." (*Id.*).

Later that day, Plaintiff informed Officer Britton that he needed pain medication at 4:00 p.m., but he did not receive the medication until 8:00 p.m. (Doc. 16, p. 15). On March 22, 2024, Plaintiff spoke with Assistant Warden Christel Crow about pain, difficulty breathing, and being placed in a vulnerable position because Dr. Myers had removed him from the infirmary following surgery with no instructions for follow-up care. (*Id.* at p. 15-16). On his way to commissary, Plaintiff also spoke to Counselor Minor about his situation. (*Id.* at p. 16). Minor stated that she would talk to her supervisor and Assistant Warden Crow about moving Plaintiff back to the infirmary. At the cell house, Plaintiff repeatedly requested pain medication but was not provided medication until 6:30 p.m. Plaintiff asked Jane Doe 1 about instructions for cleaning his nose. Jane Doe 1 said the med-techs and nurses were under instructions not to touch his nose even to clean the blood and excess mucus. (*Id.*).

On March 23, 2024, Plaintiff was seen by Nurse Allie who stated that his medical chart recorded that Plaintiff had been given antibiotics on March 21, but this entry was false. (Doc. 16, p. 16). Nurse Allie gave Plaintiff antibiotics and Vaseline but, pursuant to Dr. Myers' orders, Nurse Allie would not clean his nose. That night, Jane Doe 1 gave Plaintiff gabapentin at 6:27 p.m., but she forgot his tramadol. Jane Doe 1 told Plaintiff that he would have to wait until night med-line to receive tramadol. Plaintiff did not receive the tramadol until 8:45 p.m. (*Id.*).

The next day, March 24, Plaintiff again had to wait for pain medication until morning "med-line," and Jane Doe 1 would not clean his nose. (Doc. 16, p. 17).

On March 25, 2024, Plaintiff was moved to 6 House until his medical situation was resolved. (Doc. 16, p. 17). Plaintiff was seen by a nurse practitioner, who examined and cleaned his nose. The nurse practitioner told Plaintiff that when he was released by the infirmary, Dr. Myers did not fill out the necessary paperwork regarding "lay-in" or scheduling a follow-up appointment with the surgeon, which was supposed to happen seven days following surgery. (*Id.*).

## DISCUSSION

Based on the allegations and Plaintiff's articulation of his claims in the First Amended Complaint, the Court designates the following counts:

> **Count 1:** Eighth Amendment claim against Wexford, Brown, Mitchell, Crow, Myers, Blum, Nurse James, and Nurse Summer for deliberate indifference to Plaintiff's nose injury prior to Plaintiff's surgery on March 20, 2024.
>
> **Count 2:** Eighth Amendment claim against Crow, Myers, Britton, Brown, Jane Doe 1, and Jane Doe 2 for deliberate indifference to Plaintiff's nose injury following his surgery on March 20, 2024.
>
> **Count 3:** Americans with Disabilities Act (ADA)/ Rehabilitation Act (RA)[1] claim against for Brown for denying Plaintiff accommodations for

---

[1] Plaintiff does not mention the Rehabilitation Act (RA), 29 U.S.C. § 794(a), in the First Amended Complaint, but the Seventh Circuit has cautioned that claims of discrimination on account of a disability, especially those from a pro se prisoner litigants, should be analyzed by the district court in light of both the ADA and RA, whether or not the plaintiff has asserted a claim under the latter statute. *See Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012).

his breathing issues.

The parties and the Court will use this designation in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the First Amended Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly*[2] pleading standard.**

### Standard for Deliberate Indifference: Counts 1 and 2

To state a claim for deliberate indifference, an inmate must put forward facts implicating both an "objective and subjective element, namely that: (1) an objectively serious medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it." See *Chapman v. Keltner*, 241 F.3d 842, 845 (citing *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999)). Deliberate indifference is a high bar. "Neither negligence nor even gross negligence is sufficient basis for liability; rather, liability attaches only if the conduct is intentional or criminally reckless." *Id.* (citing *Salazar v. City of Chi.*, 940 F. 2d 233, 238 (7th Cir. 1991)). Furthermore, when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs, courts should consider the totality of the received medical care. See *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

### Count 1

Plaintiff has sufficiently stated a claim against Nurse James, Nurse Summer, Nurse Practitioner Blum, Healthcare Unit Administrator Brown, Assistant Warden Crow, and Dr. Myers for deliberate indifference to Plaintiff's nose injury prior to his surgery. See *Grieveson v. Anderson*, 538 F. 3d 763, 779-80 (7th Cir. 2008).

Count 1 will also proceed against Wexford concerning their sick call policy, policy

---

[2] See *Bell Atlantic Corp.*, 550 U.S. at 570.

regarding the care of broken noses, and the collegial review process, which all contributed to or caused a delay in Plaintiff's care.

Count 1 is dismissed as to Warden Mitchell. Plaintiff attempts to assert personal liability against Mitchell based on the fact that Mitchell deemed Plaintiff's five September grievances concerning a lack of medical care emergencies, and then, reviewed and concurred in the denial of four of Plaintiff's grievances collectively on October 11, 2023. (Doc. 16, p. 10-12, 28). Mere receipt of grievances from a prisoner, however, is insufficient to establish that a prison warden was personally involved in any deficient medical care provided to the prisoner. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."); *Neely v. Randle*, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) ("If there is 'no personal involvement by the warden [in an inmate's medical care] outside the grievance process,' that is insufficient to state a claim against the warden." (quoting *Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012))). Accordingly, Plaintiff has failed to state a deliberate indifference claim against Warden Mitchell.

### Count 2

Count 2 will proceed against Dr. Myers for failing to provide adequate post-operative care, and Britton for denying Plaintiff pain medication on March 21, 2024.

Again, Plaintiff has failed to state a claim against Assistant Warden Crow for deliberate indifference following his surgery. Plaintiff alleges that he spoke to her on March 22, 2024, about improperly being placed back in general population following his surgery. (Doc. 16, p. 15-16). On March 25, "per Assistant Warden Crow," Plaintiff was moved to 6 House until his medical issues were resolved, and he was seen by a nurse practitioner. (*Id.* at p. 17). Crow's actions do not violate the Constitution.

Likewise, Count 2 is dismissed as to Healthcare Unit Administrator Brown. Plaintiff states that he wrote a grievance on March 28, 2024, about his lack of medical treatment following his surgery and the grievance officer forwarded the grievance to Brown for a response. (Doc. 16, p. 15, 18). These facts are not sufficient to infer deliberate indifference on the part of Brown.

The Court also dismisses Plaintiff's Eighth Amendment claim against Jane Does 1 and 2. Plaintiff claims that Nurse Jane Doe 1 would not clean his nose on March 22 and March 24 because she was instructed by Dr. Myers not to touch his nose. (Doc. 16, p. 16). On March 23, he had to wait two hours for tramadol because Jane Doe 1 forgot to bring it with her when dispensing his medication. This conduct on the part of Jane Doe 1 does not amount to deliberate indifference.

As for Jane Doe 2, Plaintiff asserts that on March 24, he asked Officer Shelton and Lieutenant Tuthill to inform Jane Doe 2 that he needed pain medication. (Doc. 16, p. 16). Plaintiff was told that Jane Doe 2 would return with his medication but that she had to first administer insulin to other inmates. Jane Doe 2 did not return, and Plaintiff had to wait for morning med-line to receive his medication. The conduct allege does not violate the constitution.

### Count 3

Plaintiff alleges that he had difficulties breathing and sleeping, and a sleep study was conducted on January 12, 2024, to determine if a c-pap machine would help with his breathing issues. (Doc. 16, p. 14). The device, however, turned off in the middle of the sleep study, and a follow-up study was not conducted. Plaintiff wrote to Brown to inform her about the need for ADA accommodations and about the device turning off in the middle of the night. Plaintiff claims that "ultimately, [he] was denied all reasonable accommodations to assist with his major life activities that were being limited." (*Id.*).

The Court finds that Plaintiff has adequately stated a claim in Count 3 for violations of the ADA and/or RA. The claim cannot proceed against an individual defendant, however, because

individual employees of IDOC cannot be sued under the ADA and RA. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012). The proper defendant is the relevant state department or agency. *See* 42 U.S.C. § 12131(1)(b); *Jaros,* 684 F.3d at 670, n. 2 (individual capacity claims are not available; the proper defendant is the agency or its director (in his official capacity)). As such, Latoya Hughes, the current IDOC Director, will be **ADDED** to the case, in her official capacity only, as the proper defendant for Plaintiff's ADA and/or RA claim.

## DISPOSITION

For the reasons set forth above, the First Amended Complaint survives preliminary review pursuant to Section 1915A. **COUNT 1** will proceed against Wexford, Brown, Crow, Myers, Blum, Nurse James, and Nurse Summer and is **DISMISSED** as to Mitchell. **COUNT 2** shall proceed against Myers and Britton and is **DISMISSED** as to Crow, Brown, Jane Doe 1, and Jane Doe 2. The Clerk of Court is **DIRECTED** to **ADD** Latoya Hughes as a defendant in her official capacity only, and **COUNT 3** shall proceed against Hughes. **COUNT 3** is dismissed as to Brown. Because there are no surviving claims against Mitchell, Jane Doe 1, and Jane Doe 2, the Clerk of Court **SHALL TERMINATE** these individuals as parties on the docket.

The Clerk of Court **SHALL** prepare for Wexford, Brown, Crow, Blum, Nurse James, Nurse Summer, Britton, and Hughes (official capacity only) the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the First Amended Complaint, and this Memorandum and Order to each defendant's place of employment. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the defendant, and the Court will require the defendant pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, his last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

All Defendants are **ORDERED** to timely file an appropriate responsive pleading to the First Amended Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, the defendants only need to respond to the issues stated in this Merit Review Order.**

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 14 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:** June 9, 2025

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*s/Stephen P. McGlynn*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**STEPHEN P. MCGLYNN**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**